USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  ____________________ No. 94-1727 FRANK B. WOODMAN, Plaintiff, Appellant, v. HAEMONETICS CORPORATION, Defendant, Appellee.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Richard G. Stearns, U.S. District Judge] ___________________  ____________________ Torruella, Chief Judge, ___________ Coffin, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________  ____________________ Stuart DeBard for appellant. _____________ Jeffrey M. Hahn, with whom Foley, Hoag & Eliot was on brief for _______________ ___________________ appellee.  ____________________ April 14, 1995  ____________________ CYR, Circuit Judge. Plaintiff Frank B. Woodman appeals CYR, Circuit Judge. _____________ from a district court order granting summary judgment for Haemonetics Corporation ("HC"), Woodman's former employer, and dismissing his claim for wrongful discharge under the Age Dis- crimination in Employment Act ("ADEA"). We vacate the district court judgment and remand for factfinding. I I BACKGROUND1 BACKGROUND __________ Woodman was hired by HC in January 1981 at age forty- eight. For ten years he worked as a machinist, primarily in HC's machine shop at Holbrook, Massachusetts. Throughout his employ- ment as a machinist he consistently earned favorable performance reviews. He was promoted twice, receiving commensurate wage increases from $5.28 per hour as a Machinist Trainee, to $11.75 per hour as a Machinist B. In December 1990, at age fifty-seven, Woodman was transferred to the "bowl department" in Braintree, Massachusetts, where HC manufactures disposable components for medical equipment designed to facilitate the collection, separation and cleansing of blood and blood constituents. The medical equipment manufac- tured in the bowl department is fabricated under sterile condi- tions in a controlled-access area known as the "clean room."  ____________________ 1The essential facts are recited in the light most favorable to appellant Woodman, the party resisting summary judgment. Velez-Gomez v. SMA Life Assurance Co., 8 F.3d 873, 874 (1st Cir. ___________ ______________________ 1993). 2 On January 24, 1991, Woodman received a flawless performance report from his bowl department supervisor, Mary LeBlanc. Not only did he earn the highest possible rating in all six review categories, but LeBlanc commented: "[Y]our work since joining bowls has been exceptional. You have made a positive contribution in work and in adapting to change." Thereafter, in late March 1991, Mary LeBlanc was succeeded by Rick Lucas as Woodman's supervisor in the bowl department. Lucas began training Woodman in two non-assembly line tasks "material handling" (i.e., retrieving raw materials for use in the clean room) and "bowl packing" (i.e., packaging the finished product). The record discloses but one performance review of Woodman by Lucas, in late July 1991. Though less favorable than the LeBlanc report, the Lucas report indicated that Woodman was performing at an acceptable level. Woodman was rated "exceptional" in terms of dependability and "above average" in terms of both customer/supplier relations and quality of work. In no category did Woodman receive a rating lower than "average." Lucas added, "Frank is a highly organized, consistent performer." John Barr became Vice President of Operations for HC in mid-September 1991. Shortly thereafter, Barr directed all HC managers to reevaluate their employees, with particular emphasis on flexibility (i.e., susceptibility to cross-training and to multiple production-line responsibilities), reliability, partici- pation (i.e., the capacity to provide suggestions and contribute to improved operational efficiencies) and quality and quantity of 3 work product. The record on appeal does not reflect a perfor- mance rating on Woodman under Vice President Barr's revised performance review procedure in the fall of 1991. The record is clear, however, that many HC employees did receive performance ratings considered unacceptable by Barr. The record evidence also discloses that Barr determined that HC could terminate its "C performers" without jeopardizing its production, while dramat- ically reducing labor costs. Sometime in the fall of 1991, Mary LeBlanc resumed her supervisory role over Woodman in the bowl department. Around this same time, LeBlanc was privy to at least one discussion, among members of HC's upper management, in which future employee terminations were discussed. Following such a meeting, and in the presence of Woodman, LeBlanc referenced the management discussion relating to future terminations: "These damn people they want younger people here. They will be the one[s] that will be successful here." Woodman's affidavit attests that LeBlanc made similar statements on several occasions. During the time that HC's management was deciding which employees were to be terminated, Mary LeBlanc submitted a memo- randum, dated November 15, 1991, describing Woodman's work performance as having been unsatisfactory throughout the period "since July 1991." The November 15 memorandum made no reference to the performance review by Lucas in late July 1991. LeBlanc described Woodman as an "unmotivated worker" who "would prefer to sit in the Bowl Prep area and read for extended periods of time 4 up to several hours." She noted further that Woodman was slow, routinely requiring a minimum of thirty minutes to dress for the sterile conditions in the clean room, whereas the requisite procedures should take no longer than ten minutes. LeBlanc reported that Woodman possessed limited skills: "Frank cannot perform 50% of line operations to standard requirement. He can only be assigned 2 off line jobs in the clean room, where his performance will not affect production quantities." Furthermore, she stated, despite Woodman's training on most assembly-line operations, his inability to perform those operations in a satisfactory manner had led to the abandonment of further train- ing efforts. LeBlanc concluded: "I recommend Frank be relieved from his current duties." Five days later, in a reduction in force ("RIF"), thirty-three HC employees were terminated; twelve, including Woodman, were bowl department employees. HC presented statisti- cal evidence demonstrating that the ratio of older to younger employees in the bowl department increased slightly during the reduction in force; viz., 41% over age 40 before the RIF; 44% ___ after the RIF.2 Woodman received written notice of his immediate termination on November 20, which advised that HC had decided that it could "eliminate a group of its poorest performers and  ____________________ 2However, since the company-wide data neither support nor ____________ undermine the contention that the RIF had no discriminatory impact, additional information would be needed to draw any pertinent conclusion from these data. 5 still meet the production plan." Later, HC reported to the Massachusetts Department of Employment Training that Woodman was discharged as part of a reduction in force involving the company- 's "poorest performers." On March 2, 1993, Woodman initiated the present suit in federal district court, alleging age discrimina- tion in violation of the ADEA. In due course, the statement attributed to Mary LeBlanc by the Woodman affidavit submitted in opposition to HC's motion for summary judgment was excluded by the district court as inadmissible "totem-pole" (i.e., multiple) hearsay, "unavailing ____ on a motion for summary judgment." The court went on to conclude that though Woodman had made out a prima facie case of age dis- crimination, HC had rebutted the resulting presumption of unlaw- ful age discrimination by producing enough evidence, if credited, to enable a rational trier of fact to find a nondiscriminatory basis for Woodman's dismissal; viz., poor work performance. ___ Ultimately, the district court awarded summary judgment to HC on the ground that Woodman had not proffered competent evidence sufficient to generate a trialworthy issue as to whether imper- missible age-based discrimination constituted a determinative factor in the dismissal. Woodman appealed. II II STANDARD OF REVIEW STANDARD OF REVIEW __________________ We examine a grant of summary judgment de novo, viewing __ ____ the evidence, and all reasonable inferences therefrom, in the light most favorable to the party resisting summary judgment. 6 O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir.), cert. denied, ________ _______ ____ ______ 114 S. Ct. 634 (1993). Summary judgment is inappropriate unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Henley Drilling Co. v. McGee, 36 F.3d 143, ___________________ _____ 144 (1st Cir. 1994). No credibility assessment may be resolved in favor of the party seeking summary judgment. Velez-Gomez v. ___________ SMA Life Assurance Co., 8 F.3d 873, 877 (1st Cir. 1993).  ______________________ III III DISCUSSION DISCUSSION __________ A. The Burden-Shifting Paradigm A. The Burden-Shifting Paradigm ____________________________ The burden-shifting framework announced in McDonnell _________ Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973) ["McDonnell _____________ _____ _________ Douglas"], and imported for use in ADEA cases, see Keisling v. _______ ___ ________ SER-Jobs for Progress, Inc., 19 F.3d 755, 760 (1st Cir. 1994); ____________________________ LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993), _______ ___________________ cert. denied, 114 S. Ct. 1398 (1994), allocates burdens of ____ ______ production and orders the presentation of evidence so as "pro- gressively to sharpen the inquiry into the elusive factual question of intentional discrimination." Texas Dept. of Communi- _______________________ ty Affairs v. Burdine, 450 U.S. 248, 255 n.8 (1981); see St. __________ _______ ___ ___ Mary's Honor Ctr. v. Hicks, 113 S. Ct. 2742, 2746 (1993).  _________________ _____ At the first stage in the McDonnell Douglas matrix, __________________ Woodman was required to make a prima facie showing that he (1) 7 was at least forty years old, (2) met HC's legitimate job perfor- mance expectations, (3) experienced adverse employment action, and (4) since the challenged action was part of a reduction in ___ _________ __ force, that HC did not treat age neutrally or it retained younger _____ __ persons in the same position. Goldman v. First Nat'l Bank of _______ ____________________ Boston, 985 F.2d 1113, 1117 (1st Cir. 1993); LeBlanc, 6 F.3d at ______ _______ 842. The required prima facie showing is not especially burden- some, see Greenberg v. Union Camp Corp., No. 94-1312, slip op. at ___ _________ ________________ 4 (1st Cir. Feb. 17, 1995); Smith v. Stratus Computer, Inc., 40 _____ ______________________ F.3d 11, 15 n.4 (1st Cir. 1994), and once established, gives rise to a rebuttable presumption that the employer engaged in inten- tional age-based discrimination. Goldman, 985 F.2d at 1117 _______ (citing Burdine, 450 U.S. at 254). As Justice Scalia stated in _______ Hicks, the rebuttable presumption ultimately results in "a _____ __________ required conclusion [viz., unlawful discrimination] in the ____ __ ___ absence of explanation." Hicks, 113 S. Ct. at 2747 (emphasis _______ __ ___________ _____ added). At the second stage in the burden-shifting praxis, the defendant-employer must produce sufficient competent evidence, "taken as true," to permit a rational factfinder to conclude that _____ __ ____ ______ there was a "nondiscriminatory reason," id. at 2748 (emphasis in ___ original), for the challenged employment action, thereby displac- ing the legal presumption of intentional discrimination generated by the plaintiff-employee's prima facie case. Goldman, 985 F.2d _______ at 1117. Since neither credibility issues nor other factual matters in genuine dispute are to be resolved under it, "the 8 McDonnell Douglas framework . . . is no longer relevant" once the _________________ defendant-employer has met its burden of production at the second stage. Hicks, 113 S. Ct. at 2749. The attendant legal presump- _____ tion of intentional discrimination having served its purpose that of "forcing the defendant to come forward with some re- sponse" it "drops out of the picture." Id.  ___ At that point, the defendant-employer's motion for summary judgment cannot succeed if the plaintiff-employee, with whom the ultimate burden of persuasion remains throughout, Vega __________ ____ v. Kodak Caribbean, Ltd., 3 F.3d 476, 478 (1st Cir. 1993), has ______________________ proffered sufficient admissible evidence, if believed, to prove by a preponderance of the evidence each essential element in a prima facie case and that the employer's justification for the _____ _____ challenged employment action was merely a pretext for impermissi- ble age discrimination. Id. at 479. The plaintiff-employee may ___ rely upon the same evidence to establish both pretext and dis- crimination, provided it is adequate to enable a rational fact- finder reasonably to infer that intentional age-based discrimina- tion was a determinative factor in the adverse employment action. Goldman, 985 F.2d at 1117-18.  _______ Where the elements of a sufficient prima facie case combine with the factfinder's belief that the ostensible basis for dismissing the employee was pretextual, "particularly if . . . accompanied by a suspicion of mendacity," the factfinder is permitted to infer the intentional age-based discrimination _________ required to enable the plaintiff-employee to prevail on the 9 merits. Hicks, 113 S. Ct. at 2749 ("The factfinder's disbelief _____ ____________ of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.") (emphasis added); Woods v. _____ Friction Materials, Inc., 30 F.3d 255, 260 n.3 (1st Cir. 1994). ________________________ We conclude that Woodman made out just such a case in the dis- trict court, thereby precluding summary judgment for HC. __________ B. Woodman's Prima Facie Case B. Woodman's Prima Facie Case __________________________ The district court correctly concluded that Woodman had established a prima facie case of impermissible age-based dis- crimination in employment. At age fifty-seven, Woodman was discharged as part of a reduction in force, while younger persons were retained in the bowl department. See Goldman, 985 F.2d at ___ _______ 1117. As the district court noted, the only substantial question was whether Woodman had met the employer's legitimate job-perfor- mance expectations. Woodman cleared this hurdle with his proffer of substantial wage increases and ten years of positive perfor- mance reviews, blemished by but one negative performance evalua- tion five days prior to the reduction in force. See, e.g., ___ ____ Woods, 30 F.3d at 261 (history of largely favorable performance _____ reviews and extensive experience in industry adequate to generate at least a genuine issue as to plaintiff-employee's ability to meet legitimate job expectations); Keisling, 19 F.3d at 760 ________ (similar). It then became incumbent upon HC to rebut the result- 10 ing legal presumption that the determining factor in its decision to discharge Woodman was impermissible age-based discrimination. 11 C. HC's Rebuttal  C. HC's Rebuttal _____________ At the second stage in the McDonnell Douglas analysis, ______ _____ _________________ the district court concluded again correctly that HC had rebutted the legal presumption of intentional age discrimination with evidence relating to Woodman's work performance since joining the bowl department. See Hicks, 113 S. Ct. at 2748 ("By ___ _____ producing evidence (whether ultimately persuasive or not) of non- ________ discriminatory reasons, [defendants] sustained their burden of production . . . ."). Crediting the competent evidence adduced by HC, see id., Woodman's performance in the machine shop may ___ ___ have been very good, but he never mastered the tasks required in the bowl department. Thus, the presumption of unlawful age discrimination vanished from the case. Id. at 2749; Vega, 3 F.3d ___ ____ at 479. In order to avoid summary judgment at that point it was _____ essential that Woodman proffer sufficient competent evidence to _________ generate a trialworthy issue on the ultimate question whether intentional age-based discrimination was a determinative factor in his dismissal. Id.  ___ First, Woodman attacked the final performance evalua- tion by Mary LeBlanc on November 15, 1991 five days before the reduction in force by contrasting the laudatory performance review of January 24, 1991, with the final review less than nine months later in which LeBlanc's assessment plummeted from high praise to a recommendation that Woodman be relieved of his current duties. The Woodman affidavit itself attested to facts 12 directly contradicting several key assertions made by LeBlanc in her final work performance evaluation. He also tendered state- ments from a former supervisor in the machine shop and a former group leader in the bowl department, attesting to the high quality of his work. Second, and most importantly, the Woodman affidavit asserted that Mary LeBlanc had stated in his presence, following a meeting with upper management shortly before HC implemented its reduction in force: "These damn people they want younger people here. They will be the one[s] that will be successful here." Under the summary judgment analysis required once the McDonnell Douglas framework dropped out of the picture, see __________________ ___ Hicks, 113 S. Ct. at 2749, the district court was required to _____ consider whether Woodman presented sufficient competent, i.e., _________ ____ admissible, evidence, see Murphy v. Timberlane Regional Sch. ___ ______ _________________________ Dist., 22 F.3d 1186, 1196 (1st Cir.) (citing Anderson v. Liberty _____ ________ _______ Lobby, Inc., 477 U.S. 242, 248 (1986)), cert. denied, 115 S. Ct. ___________ ____ ______ 484 (1994), to warrant a trial on the ultimate question whether unlawful age-based discrimination was a determinative factor in his dismissal by HC. It was at this juncture that the district court excluded the linchpin in Woodman's opposition to summary judgment the vicarious admission that Woodman attributed to LeBlanc as inadmissible "totem-pole" hearsay. D. Woodman's Demonstration of Pretext D. Woodman's Demonstration of Pretext __________________________________ The twofold thrust implicit in the evidentiary prof- fers made by Woodman was that the November 15, 1991, LeBlanc 13 memorandum severely denigrating his work performance was a pretext for unlawful age-based discrimination on the part of HC, as indicated not only by Woodman's own work-performance evidence but by the vicarious HC admission, through LeBlanc, that new management disfavored older employees. The factfinding inquiry into pretext focuses on "wheth- er the employer believed its stated reason to be credible." ________ ________ Goldman, 985 F.2d at 1118 (quoting Mesnick, 950 F.2d at 824) _______ _______ (emphasis added). Thus, Woodman's evidence, including the vicarious admission made through LeBlanc if credited by the factfinder would be adequate not only to permit a reasonable ______ inference that HC's articulated justification for Woodman's dismissal was a mere pretext for intentional age discrimination, but also to generate a grave "suspicion of mendacity" respecting the highly unfavorable performance rating made in the LeBlanc memorandum five days prior to Woodman's dismissal. See Hicks, ___ _____ 113 S. Ct. at 2749.3 Consequently, the putative vicarious  ____________________ 3The statistical evidence presented by HC, in an effort to show that older workers as a whole were not more severely affect- ___ ed by the reduction in force, is clearly relevant and might strengthen the employer's defense. See Healy v. New York Life ___ _____ _____________ Ins. Co., 860 F.2d 1209, 1217 (3d Cir. 1988), cert. denied, 490 ________ ____ ______ U.S. 1098 (1989) (disparate treatment claim); see also Connecti- ___ ____ _________ cut v. Teal, 457 U.S. 440, 454 (1982) ("[A] nondiscriminatory ___ ____ 'bottom line' and an employer's good-faith efforts to achieve a nondiscriminatory work force, might in some cases assist an employer in rebutting the inference that particular action had been intentionally discriminatory."). But by itself, rarely will an employer's statistical evidence relating to company-wide workforce composition provide a conclusive defense against a disparate treatment discrimination claim at summary judgment where the employee has established a prima facie case and pretext accompanied by a suspicion of mendacity. See Healy, 860 F.2d at ___ _____ 1218 (expressing skepticism concerning conclusiveness of employe- 14 admission by HC, through LeBlanc, is crucial to our de novo __ ____ determination whether HC was entitled to summary judgment as a matter of law. See Goldman, 985 F.2d at 1116.  ___ _______ (i) The Vicarious Admission (i) The Vicarious Admission _______________________ On appeal, HC argues that the excluded statement does not come within Evidence Rule 801(d)(2)(D) because LeBlanc was only a "first-line" supervisor, with no authority to make termi- nation decisions.4 However that may be, Rule 801(d)(2)(D) does not contemplate as HC seems to suppose that the statement be shown to have been made by the employee at the instance of her employer, compare Fed. R. Evid. 801(d)(2)(C) with Fed. R. Evid. _______ ____ 801(d)(2)(D), but only that the declarant's statement concern _______ matters within the scope of her agency or employment. Fed. R. Evid. 801(d)(2)(D). See, e.g., Union Mut. Life Ins. Co. v. ___ ____ ___________________________  ____________________ r's uncontested data showing no change in workforce composition, both department-wide and company-wide, after reduction in force); see also Furnco Constr. Corp. v. Waters, 438 U.S. 567, 579 (1978) ___ ____ ____________________ ______ ("A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination.") (disparate treatment claim); Teal, 457 U.S. at 455 ("Congress never intended ____ to give an employer license to discriminate against some employ- ees . . . merely because he favorably treats other members of the employees' group.") (disparate impact case). 4Rule 801(d)(2)(D) states that [a] statement is not hearsay if . . . [the] statement is offered against a party and is . . . . a statement by the party's agent or servant concerning a matter within the scope __________ of the agency or employment, made during the existence of the relationship. Fed. R. Evid. 801(d)(2)(D) (emphasis added). 15 Chrysler Corp., 793 F.2d 1, 8-9 (1st Cir. 1986); Hoptowit v. Ray, ______________ ________ ___ 682 F.2d 1237, 1262 (9th Cir. 1982). The record reflects that LeBlanc was acting within the scope of her employment in (i) attending the HC management meeting, (ii) assessing the performance of bowl department employees under her supervision (including Woodman), and (iii) in ___ recommending that Woodman be relieved from his duties. Thus, the circumstantial evidence proffered in the Woodman affidavit provided a plainly sufficient foundation, see Fed. R. Evid. ___ 103(a)(2), for finding both that LeBlanc was directly involved in the reduction in force and that the excluded statement concerned matters within the scope of her employment. Indeed, any contrary suggestion is belied by HC's firm reliance on LeBlanc's adverse performance evaluation as the principal justification for its decision to terminate Woodman. Finally, the circumstantial evidence proffered in the Woodman affidavit attests, and the excluded statement itself reflects, that LeBlanc purported to be communicating to Woodman information acquired at the HC manage- ment meeting. We conclude that though the Woodman affidavit may ___ reflect that LeBlanc's description of HC management's attitude toward older workers was predicated on more than one statement made at the management meeting in LeBlanc's presence, her state- ment to Woodman was not hearsay, even though offered for its truth. See Hybert v. Hearst Corp., 900 F.2d 1050, 1053 (7th Cir. ___ ______ ____________ 1990) (finding no error where trial court, in ADEA action, 16 admitted into evidence the statement made by manager to sub- ordinate that "it's a concern of some of the guys in New York that some of our people in their sixties are going to be replaced"); see also Brookover v. Mary Hitchcock Memorial Hosp., ___ ____ _________ _____________________________ 893 F.2d 411, 417-18 (1st Cir. 1990) (holding that nurses' statements that bed restraints should have been used on patient were made within scope of nurses' employment); Union Mut. Life ________________ Ins. Co., 793 F.2d at 8-9 (holding that statement by lower level ________ accountant, charged with preparing billings relating to employer- 's leases, concerned matter within scope of accountant's employ- ment, in circumstances where information upon which proffered statement was based was located in file in accountant's posses- sion within the scope of employment). Accordingly, the eviden- tiary ruling constituted an abuse of discretion, as it was based upon a misapplication of Rule 801(d)(2)(D) and resulted in a denial of Woodman's right to trial on the ADEA claim. See Siegal ___ ______ v. American Honda Motor Co., Inc., 921 F.2d 15, 17 (1st Cir. ________________________________ 1990). IV IV CONCLUSION CONCLUSION __________ A rational factfinder could conclude that the errone- ously excluded non-hearsay statement attributed to Mary LeBlanc provided cogent evidence probative not only of pretext and impermissible age-based discrimination on the part of HC, see ___ Goldman, 985 F.2d at 1117-18 (plaintiff-employee may rely on same _______ evidence to prove both pretext and discrimination), but also of 17 the untruthfulness of the LeBlanc performance review immediately ______________ preceding Woodman's dismissal. See Hicks, 113 S. Ct. at 2749. ___ _____ We express no view whatever on these credibility issues, of course, except to note that at summary judgment such questions were to be resolved in favor of Woodman. See Velez-Gomez, 8 F.3d ___ ___________ at 877. HC was not entitled to summary judgment, given the competent evidentiary proffer that its articulated reason for discharging Woodman was an untruthful pretext for intentional age-based discrimination. See Hicks, 113 S. Ct. at 2749. ___ _____ Consequently, the district court judgment must be vacated and the ADEA claim must be remanded for factfinding. The district court judgment is vacated. The case is The district court judgment is vacated. The case is ________________________________________ ____________ remanded for further proceedings consistent with this opinion. remanded for further proceedings consistent with this opinion. ________________________________________________________________ Costs are awarded to appellant. Costs are awarded to appellant. ______________________________ 18